UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ERIC J. DURAND,           )  | |
|                 Petitioner,   ) | |
| v.                        )  | CIVIL ACTION |
|                           )  | No. 18-40158-TSH |
| COLETTE GOGUEN,           )  | |
|                 Respondent.   ) | |

**AMENDED MEMORANDUM OF DECISION AND ORDER
ON PETITIONER'S WRIT OF HABEAS CORPUS**
March 24, 2022

Proceeding *pro se*, Petitioner Eric J. Durand ("Petitioner") has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his state court conviction. (Docket No. 1). Collette Goguen ("Respondent") opposes the motion and argues that because the Petitioner's claims have been transformed such that they are unexhausted and because the decision of the Supreme Judicial Court of Massachusetts ("SJC") that the petitioner's rights were not violated on either of the claims he raises was reasonable and consistent with clearly established federal law.

**Background**

On August 29, 2011, a jury convicted Petitioner of murder in the first degree by extreme atrocity or cruelty, and assault and battery by means of a dangerous weapon, in connection with the October 2003 death of a four-year-old child, Brendon Camara. *Commonwealth v. Durand*, 475 Mass. 657, 658 (2016). The facts underlying Petitioner's conviction, recounted below, are

set out in the opinion of the SJC. The factual findings of the state court are presumed to be correct. 28 U.S.C. § 2254(e)(1); *Scoggins v. Hall*, 765 F.3d 53, 57 (1st Cir. 2014).

> At around the time of the victim's death, the defendant was the boyfriend of the victim's mother. The mother lived with her children, the victim and his twin brother, in the basement of a friend's home. The defendant was a frequent overnight guest. Although the defendant had a good relationship with the victim's twin brother (twin), his relationship with the victim was strained. The defendant often called the victim "pissy pants" or "piss pants" because the child "sometimes" urinated in his pants and was not as large as his older twin. The defendant did not like that the victim was "clingy" with his mother and antagonized the child and called him "Mama's boy." This conduct intimidated the victim and occasionally caused him to cry.
>
> On October 20, 2003, the date of the victim's death, the mother departed early in the morning for work and left the victim and his twin with the defendant. A roommate who lived in one of the basement rooms, and who often took care of the twins, was also at home. Later that morning, the victim urinated on himself and the defendant told him to stand in the corner as punishment. When the victim asked to use the bathroom, the defendant refused. The defendant called the victim "piss pants." When the victim turned around in response, the defendant threw a toy shark at the child's face. The roommate, who was present, later testified that the defendant threw the toy "kind of hard," and that he "looked a little angry or mad" as he did so.
>
> When the defendant began to take care of the victim's wet clothes, the victim urinated on the defendant's pants. The defendant showed the roommate the wet spot on his pants, and although she thought that the defendant seemed upset, he stated that it was "no big deal" because he could just go home and get another pair of pants. The defendant took the victim into the upstairs bathroom to wash him while the roommate went upstairs to the kitchen. She came across the twin while she was upstairs and took him back down-stairs to the twins' room. She noticed that the victim was lying on the bed, not moving, but also that he did not look to be in any distress. She returned upstairs.
>
> Thereafter, the defendant came upstairs to tell the roommate that the victim had fallen down the stairs. The roommate remained at the computer she was using; the defendant returned to the basement. Soon thereafter, the defendant returned upstairs and told her that the victim was "acting weird." Again, she remained at the computer and the defendant went back to the basement. Moments later, the defendant returned a third time and said that something was "seriously wrong." The roommate ran downstairs to the twins' bedroom and found the victim lying in bed, not moving, with his eyes rolled back. She telephoned the mother, who spoke

to the defendant and told him to telephone 911. He did so. During both telephone calls, the defendant explained that the victim had fallen down the stairs. Emergency medical technicians arrived and found the victim "cool, cold" to the touch. They were not able to resuscitate the victim, who was later pronounced dead at a hospital. That same day, detectives from the New Bedford police department asked the defendant if he would accompany them to the police station for an interview. The defendant agreed. His six-hour interview was recorded with the defendant's consent. During that interview, the defendant alternately told the police that he had carried the victim down the stairs and that the victim had been injured by falling down the stairs. He also denied throwing anything at the victim. However, he admitted to police that while he was in the bathroom with the victim, he noticed that the victim appeared "scared" and was shaking while using the toilet. The detectives informed the defendant that the victim had died and that the victim's injuries were not consistent with a fall down the stairs. Despite aggressive questioning, the defendant repeatedly denied any involvement in the victim's death. After the defendant left the police station, he telephoned the roommate and told her not to say anything to the police about his throwing the toy shark at the victim because "they didn't need to know."

The following day, the mother went to the defendant's home. During the conversation, the defendant claimed that the victim fell down the stairs. The police arrived and requested another interview, and the defendant agreed. He went to the police station, and this interview also was recorded. Detectives informed him that an autopsy report showed that the cause of death was a blow to the victim's stomach. The defendant again denied involvement in the victim's death. The police arrested the defendant for murder. While being transported for his arraignment, the defendant tearfully confessed to a security officer that he had tripped on the stairs and fallen on the victim.

The medical testimony was that the victim died as a result of blunt force trauma to the abdomen, resulting in a rupture of the duodenum and a transection of the pancreas. The fatal injuries were not consistent with a fall down a flight of stairs or with a blow delivered by a child of the same age as the victim's brother. The defendant's theory, that the victim's injuries were caused by his twin brother during horseplay, was supported by an expert witness who opined that the injuries could have resulted from the twin jumping on the victim's stomach.

*Durand*, 475 Mass. at 659-61.

## Procedural History

Petitioner was convicted by a jury on November 7, 2006 of murder in the first degree and assault and battery by means of a dangerous weapon in connection with the death of the four-

year-old child.  (ADD 2, 9).¹  Petitioner filed a notice of appeal on January 2, 2007.  *Id.* at 12.  On August 19, 2010, the SJC reversed this decision and remanded the case to the Superior Court for a new trial.  *Commonwealth v. Durand*, 457 Mass. 574, 601 (2010).

On August 29, 2011, a jury again found the Petitioner guilty of murder in the first degree and one count of assault and battery by means of a dangerous weapon.  (ADD 15).  The Petitioner was sentenced to life in prison without the possibility of parole for the murder conviction and a concurrent sentence of two to four years for the assault and battery conviction.  *Id.*.  Petitioner filed a notice of appeal on September 21, 2011.  *Id.*.

On appeal, Petitioner asserted error in (1) the limitation of his right to cross-examine the medical examiner; (2) the denial of his motion to suppress statements; (3) the denial of the motion for a mistrial after the jury were exposed to inadmissible evidence; (4) the admission of hearsay testimony by one of the Commonwealth's expert witnesses; (5) the denial of the motion for a mistrial related to improper statements made during closing arguments; (6) the denial of the motion to dismiss on double jeopardy grounds for prosecutorial misconduct; and (7) the denial of a requested jury instruction.  *Durand*, 475 Mass. at 658-59.  The SJC concluded that, while the Commonwealth's closing argument improperly referenced inadmissible evidence, this error alone did not require a new trial or other relief.  *Id.* at 659.  After reviewing the entire record pursuant to Mass. Gen. L. c. 278, § 33E, the SJC affirmed the convictions.  *Id.* at 674.  On November 28, 2016, Petitioner filed a petition for rehearing in the SJC.  (ADD 18).  The SJC denied the petition on January 27, 2017.  *Id.*

On June 21, 2017, Petitioner filed a petition for a writ of certiorari in the United States Supreme Court.  (*Id.* at 21).  The petition was denied on October 2, 2017.  *Id.*

---

¹ The addendum filed with the Respondent's motion to dismiss on February 27, 2019, cited as ADD, is available at Docket No. 13.

Petitioner filed the instant petition for writ of habeas corpus in this court on September 21, 2018. (Docket No. 1). In his petition, Petitioner raised twelve grounds for relief. *Id*. Petitioner acknowledged that grounds five through twelve, all alleging various claims of ineffective assistance of counsel, were not exhausted in the state court. *Id.* at 12-15. On the same day that he filed his petition, Petitioner filed a motion to hold the petition in abeyance to allow him to return to state court to exhaust those claims. (Docket No. 2).

On June 28, 2019, the court entered an order finding that Petitioner had not exhausted grounds five through twelve and that he was not entitled to a stay in order to exhaust those claims. (Docket No. 14). The court also issued a certificate of appealability on the issue of whether Petitioner had good cause to excuse his failure to exhaust. *Id.* On July 15, 2019, Petitioner filed a motion to stay the petition pending his appeal of the court's denial of his motion to hold the petition in abeyance or, alternatively, to voluntarily dismiss grounds five through twelve of his petition. (Docket No. 16). On November 12, 2019, the court entered an order denying Petitioner's request for a stay, denying Petitioner's request that the court amend its June 28, 2019 order and thereby allow for an interlocutory appeal, dismissing grounds five through twelve of the petition, and allowing Petitioner to proceed on grounds one through four of the petition. (Docket No. 31). Respondent filed an answer to the petition on December 5, 2019. (Docket No. 33).

On February 24, 2020, Petitioner voluntarily dismissed grounds two and three of his petition. (Docket No. 36). He also filed a memorandum of law in support of his habeas petition on the remaining two grounds – grounds one and four. (Docket No. 37). Respondent filed a response in opposition to the petition on May 27, 2020, (Docket No. 4) to which Durand replied on August 10, 2020. (Docket No. 43).

**Petitioner's Habeas Petition and Standard of Review**

"Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), [Petitioner] must show that the challenged state court adjudication was 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or that the decision 'was based on an unreasonable determination of the facts.'" *Pena v. Dickhaut*, 736 F.3d 600, 603 (1st Cir. 2013) (*quoting* 28 U.S.C. § 2254(d)). This "highly deferential" standard of review "requires the petitioner to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement.'" *Id*. (*quoting Burt v. Titlow*, 571 U.S. 12, 20-21 (2013)) (alteration in original).

"Clearly established federal law" under § 2254(d)(1) refers to the "governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision" and must be "holdings, as opposed to the dicta." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (internal quotation omitted). A state court decision is "contrary to" existing Supreme Court precedent if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court; or (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court but reaches a result different from Supreme Court precedent. *Dagley v. Russo*, 540 F.3d 8, 16 (1st Cir. 2008) (*quoting Early v. Packer*, 537 U.S. 3, 8 (2002)).

"[A] state court adjudication constitutes an unreasonable application 'if the state court identifies the correct governing legal principle from the Supreme Court's then-current decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Hensley v. Roden*, 755 F.3d 724, 731 (1st Cir. 2014) (*quoting Abrante v. St. Amand*, 595 F.3d 11, 15 (1st Cir. 2010)). State court applications of federal law must be more than "incorrect or erroneous" to merit

habeas relief; they must be "objectively unreasonable." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).

When determining whether the state court's decision was based on an unreasonable determination of the facts, reviewing courts "may not characterize . . . state-court factual determinations as unreasonable 'merely because [they] would have reached a different conclusion in the first instance." *Brumfield v. Cain*, 576 U.S. 305, 313-14 (2015). Pursuant to 28 U.S.C. § 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be correct." This presumption applies to findings of historical, basic or primary facts – "facts in the sense of a recital of external events and the credibility of their narrators." *Coombs v. Maine*, 202 F.3d 14, 18 (1st Cir. 2000) (*quoting Bryson v. Ward*, 187 F.3d 1193, 1211 (10th Cir. 1999)). The petitioner may rebut this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Review under § 2254(d)(2) "is limited to the record that was before the state court." *Garuti v. Roden*, 733 F.3d 18, 23 (1st Cir. 2013) (quotation and alteration omitted).

## Discussion

Petitioner proceeds on the two remaining grounds for relief in his petition: Ground One, restricting Petitioner's cross examination of the Commonwealth's expert witness violated Petitioner's Sixth Amendment Right and Ground Four, the prosecutor's improper comments during closing argument violated due process and Petitioner's Sixth and Fourth Amendment rights. (Docket No. 1 at 5, 10).

I.      Ground One

In Ground One of his petition, Petitioner asserts that the trial court's restriction on his cross-examination of Dr. Abraham Philip violated his Sixth Amendment confrontation rights. Specifically, Petitioner claims that he was "prohibited from cross-examining Dr. Philip about

email messages that he sent to members of the [Office of the Chief Medical Examiner ("OCME")] and the District Attorney's Office that would have significantly undermined the veracity and reliability of the only piece of evidence that declared a homicide in this case occurred – the autopsy report."

On October 21, 2003, the day after the victim's death, Dr. Philip, then working for the OCME, performed an autopsy on the victim. (SA. 685).[2] Dr. Philip concluded that the victim's death was caused by blunt trauma to the abdomen, with rupture of the duodenum and transection of the pancreas. (SA. 793). Dr. Philip later testified to these facts at Petitioner's trial. (SA. 685, 793).

On March 1, 2004, Dr. Philip sent the following email to Assistant District Attorney Lewis Armistead:

> Lewis,
>
> I finalized the report on Brendon Camarra, a few corrections have to be made, which my secretary will do early this morning. My problem is I cannot find the original charts on this case, to check if everything else is okay. The last I heard the file was with Jackie Faherty,[3] and she locked it in her office and has been away on Thursday and Friday.
>
> There are some other very bizarre events going on in the office with weird accusations being levelled against me. So when you arrange with Jackie Faherty to hand over the file to me, please insist that a witness be present in the room to prevent weird charges of having urinated on the chart or farted while working on the chart being levelled against me by the head honcho who runs this agency.
>
> Thanks,
>
> Abraham.

---

[2] The supplemental answer, cited as SA. is available at Docket No. 33-1 through 33-4.

[3] At the time this email was written, Jackie Faherty was general counsel for OCME. *Philip v. Cronin*, 537 F.3d 26, 30 (1st Cir. 2008).

(Docket No. 37-1 at 44). Dr. Philip was fired from the OCME in March 2004, due in part to sending this email. *See Philip v. Cronin*, 537 F.3d 26, 31-32 (1st Cir. 2008). The basis for his termination was not related to the quality of his work, nor his ability or competence to conduct an autopsy. *Id.*

On direct examination, Dr. Philip explained the procedures and method used to perform the autopsy. (SA. 685-795) He testified as to his findings and the ultimate cause of the victim's death. *Id.* On cross-examination, Petitioner's counsel sought to question Dr. Philip about his issues with the OCME, based on this email, including why Dr Philip did not have access to the file and why he was terminated.[4] (SA. 832-36). Counsel claimed this inquiry was relevant to Dr. Philip's credibility. (SA. 832-36, 840-42).

After hearing from both parties and reading the email at issue, the trial judge stated that he would not let the jury "be diverted into the case against the public at large or Dr. Philip against the Office of the Chief Medical Examiner," noting that the case should be "tried on what is relevant and not tried on what is extraneous." (SA. 838). The trial judge explained that he would allow general questions about whether Dr. Philip was able to complete the autopsy report in a timely way, whether he was not able to finish the report because he did not have access to something, whether he had a diminished memory because time had passed, whether he felt crowded by other work responsibilities, and whether he felt pressure to get the report done quickly. (SA. 838-39). The trial judge concluded, "I have not in any way been convinced that there is a relevance to that E-mail that outweighs the misleading effect and that prevents this jury

---

[4] In his exhibits to his memorandum in support of his petition, Durand attaches a copy of the subject email as well as an email sent by Dr. Philip to Armistead on March 3, 2004 and an email sent by Dr. Philip to Faherty copying Armistead on March 2, 2004. (Docket No. 37-1 at 45-46). In his memorandum, Durand asserts that he sought to cross-examine Dr. Philip on these additional emails. (Docket No. 37 at 9-10). The record does not support this assertion. Petitioner's counsel was clear that he sought to cross-examine Dr. Philip on the first email. (*See* SA. 835-36, 840). Furthermore, this was the only email quoted by Petitioner in his brief to the SJC. (Docket No. ADD 74-75). However, consideration of the additional emails would not alter this Court's findings.

from being distracted.  I see very little probative value, if any, to that. … I order you not to go into that E-mail in your examination of [Dr. Philip]." (SA. 842).

During cross-examination, Petitioner's counsel asked Dr. Philip several questions about the report, including whether there was a period in which he did not have access to the file. (SA. 846). Dr. Philip responded that he did not have access for a few days. *Id.* When asked whether it was a normal occurrence to lose access to a file while doing autopsies, Dr. Philip testified that it was his policy to take one file at a time to work on, but in this case, "the person who took the file went on vacation or leave or something like that." (SA. 847). Dr. Philip also agreed that the autopsy report in this case took an extraordinarily long time to complete. *Id.*

To exhaust a claim, a habeas petitioner must present the substance of the claim to the state's highest tribunal – in Massachusetts, the Supreme Judicial Court. *Josselyn v. Dennehy*, 475 F.3d 1, 3 (1st Cir. 2007). The exhaustion requirement applies to the predicate facts and the federal legal theories underlying each claim. *See Jackson v. Coalter*, 337 F.3d 74, 86 (1st Cir. 2003); *see also Nadworny v. Fair*, 872 F.2d 1093, 1096 (1st Cir. 1989). More specifically, a "petitioner must 'present the federal claim fairly and recognizably' to the state courts, meaning that he 'must show that he tendered his federal claim 'in such a way as to make it probable that a reasonable jurist would have been alerted to the existence of the federal question.''" *Clements v. Maloney*, 485 F.3d 158, 162 (1st Cir. 2007), *quoting Casella v. Clemons*, 207 F.3d 18, 20 (1st Cir. 2000).

Petitioner's defense counsel's position at trial was that the e-mail went to the witness's credibility and competency and that he should be able to inquire about Dr. Philip's termination from the OCME. (SA.8322-836). Similarly, in his SJC brief, the Petitioner argued two main points: 1) that the e-mail reflected Dr. Philip's "biases and motivations" (ADD.92); and 2) that he had "the constitutional right to explore why the OCME terminated Dr. Philip and how his

10

actions that led to his termination – involving the autopsy in this case – impacted his judgment, professionalism, and competence" and that being prevented from cross-examining Dr. Philip about his "competence and credibility constitutes reversible error." (ADD. 94). In the state court, the petitioner did not make any of the following specific allegations that he advances here: that the autopsy file and report were inaccurate and unreliable; that it was Dr. Philip who broke the chain-of-custody; that the autopsy report was altered or tampered with; or that Dr. Philip is the one who tampered with the report. (Docket No. 37, Pl. Memo at.7-8; 13; 14-15).

Here, the petitioner alleges that his rights were violated because "the jury needed to learn about the judgment Dr. Philip made to break chain-of-custody, because that decision created the opportunity for the autopsy file to be tampered with." (Pl. Memo at 14.)

The SJC understood his claim to be that the e-mail message was the basis for Dr. Philip's termination and was therefore probative of his "competence and bias." *Durand*, 475 Mass. at 661. The Petitioner's counsel did not make this argument at trial, nor does this type of allegation appear in his SJC brief. (ADD. 91-95). To the extent the petitioner is presenting new legal theories here that broaden his federal claim and cast it in a different light, his claim is unexhausted. *See Domaingue v. Butterworth,* 641 F.2d 8, 12 (1st Cir. 1981).[5]

## II.     Ground Four

In Ground Four of his petition, Petitioner argues that the prosecutor misstatement of the evidence during closing argument violated his due process right to a fair trial. (Docket No. 1 at 10; Docket No. 37 at 16).

During closing argument, the prosecutor made the following statement, asserting that the Petitioner denied throwing a toy rubber shark at the victim:

---

[5] Consistent with the Court's opinion of June 28, 2019 (Docket No. 14), I find that the Petitioner's failure to exhaust his claim is not excused by good cause.

> And then you're going to be asked to evaluate the credibility of the defendant on the one day that he's not stuck with the kids, on the one day that everything seems to be going wrong; and you're going to be asked if he was truthful.  And you'll recall in the course of his statements . . .  He told the police he never – they asked him, "Did you ever throw anything at the boy when he was in the corner – sorry – that day?  Did you ever throw anything?  No."  We know that's not true.  He threw the shark, hit him in the mouth.

(SA. 2195-96).  Contrary to the prosecutor's suggestion, Petitioner had admitted to throwing the shark during the second police interview on October 21, but the judge had suppressed this statement on the ground that it was not voluntary in light of police promises of leniency.  *Durand*, 475 Mass. at 672.  The SJC acknowledged the Commonwealth's argument that this statement was permissible and did not undermine the judge's suppression ruling because the statement described Petitioner's October 20 statement to the police in which he denied throwing the toy was not subject to the suppression order and that denial was admitted into evidence as part of the audio-visual recording of the October 20 interview.  *Id.*  The SJC then went on to note that, while the prosecutor's statement did not violate the letter of the judge's suppression order, "it undoubtedly undermined the spirit of the ruing where it unfairly suggested that the defendant withheld the information and that this act reflected consciousness of guilt."  *Id.*  The SJC concluded: "Although we are constrained to conclude that this error was not prejudicial, we note our concern with such unfair tactics that undercut the intended effect of the judge's ruling."  *Id.*

Whether a prosecutor's remarks during closing arguments rise to a due process violation turns not on whether the prosecutor's remarks "were undesirable or even universally condemned" but instead on "whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Olszewski v. Spencer*, 466 F.3d 47, 59 (1st Cir. 2006) (*quoting Darden v. Wainwright*, 477 U.S. 168, 181 (1986)).  This standard requires "'case-by-case determinations' about factors like the nature and seriousness of

the comments, whether the comments were invited by defense arguments, whether the jury was adequately instructed, and the weight of the evidence." *Hardy v. Maloney*, 909 F.3d 494, 501 (1st Cir. 2018) (*quoting Parker v Matthews*, 567 U.S. 37, 48 (2012)).

The SJC reasonably applied this legal framework in rejecting Petitioner's claim. While it did not cite federal law, the SJC correctly identified the standard for its review, stating "[r]emarks made during closing arguments are considered in the context of the whole argument, the evidence admitted at trial, and the judge's instructions to the jury." *Durand*, 475 Mass. at 670 (*quoting Commonwealth v. Andrade*, 468 Mass. 543, 552 (2014)). Applying this standard, the SJC concluded that the prosecutor's closing argument contained an improper reference to an inadmissible statement but that the court was constrained to conclude that the error was not prejudicial. *Id*. at 672.

The comment at issue here constitutes only five lines in a forty-two-page closing.[6] (SA. 2161-2203). The challenged statement is part of a larger inventory of allegedly false exculpatory statements that the defendant made to the police.[7] (SA. 2195-96). These other allegedly false

---

[6] The trial judge allocated each side seventy minutes for closing arguments. (SA. 2132).

[7] The paragraph of the closing containing the challenged statement reads in full:

> And then you're going to be asked to evaluate the credibility of the defendant on the one day that he's now stuck with the kids, on the one day that everything seems to be going wrong; and you're going to be asked if he was truthful. And you'll recall in the course of his statements, things that were asked, despite that he wanted to be truthful, and he'd help out in any way, he tells the police he stayed in the kitchen. That was false. We know that. He then told the police that Brendon and Michael [Brendon's twin brother] walked downstairs. We know that's false. He told the police that he never hit Brendon. That's false. He told the police he never kicked the child. That's false. He told the police that the victim said he was okay. We know that's not true. He told the police that Michael said he fell down the stairs. And then later, "Well, he actually only said he fell, and I kind of filled in the details there." He told the police he made Brendon clean up the pee. We know that didn't happen. You have a photograph of that. He told the police he never – they asked him, "Did you ever throw anything at the boy when he was in the corner – sorry – that day? Did you ever throw anything? No." We know that's not true. He threw the shark, hit him in the mouth. He told the police he had never hit him that day, which was again a lie. He told the EMTs [he] fell four to five stairs, and then got up and walked to bed. We know that's not true either, baed on the medical testimony.

exculpatory statements were recited in support of consciousness of guilt, the same reason the challenged statement was cited. *Id.* The error of this brief, isolated statement must be evaluated against the strong evidence of Petitioner's guilt. The Commonwealth's evidence at trial showed that the victim died of blunt force trauma sustained within two hours of his death, and that his injuries could not have been caused by a fall down the stairs or from playing with his brother. (SA. 774, 778-79, 781, 788, 805-07, 1078-79, 1101-02, 1107). The evidence also showed that Petitioner was the only adult with the opportunity to inflict the fatal injuries, which would have required a substantial amount of force. (SA. 774, 1199-1200, 1336-68, 1370, 1381). While no curative instruction was requested nor given, prior to closing arguments, the trial judge admonished the jury that the lawyer was not a witness and "if a lawyer happens to say something not found explicitly or inferentially in the evidence, then the lawyer's words must be consciously disregarded." (SA. 2133). In light of this background, the SJC's determination that the erroneous statement was not prejudicial was not an unreasonable application of clearly established Federal law. Accordingly, the undersigned finds that Petitioner is not entitled to relief on this claim.[8]

---

(SA. 2195-96).

[8] Having reviewed Petitioner's claim on the merits, the undersigned declines to address respondent's arguments that the claim is unexhausted as well as procedurally defaulted. *See* 28 U.S.C. §2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State").

## **Conclusion**

For the reasons stated above, Durand's petition for habeas corpus (Docket No. 1) is *denied* and the instant matter is **DISMISSED**.


**SO ORDERED**

**/s/ *Timothy S. Hillman*** 
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**
